**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

NATALIE GIANNE, and KAREN LARSON, individually and on behalf of all others similarly situated,

      Plaintiffs,

      v.

CONTINENTAL AKTIENGESELLSCHAFT; CONTINENTAL TIRE THE AMERICAS, LLC; COMPAGNIE GÉNÉRALE DES ÉTABLISSEMENTS MICHELIN SCA; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES PLC; NOKIAN TYRES INC; NOKIAN TYRES U.S. OPERATIONS LLC; THE GOODYEAR TIRE & RUBBER COMPANY; PIRELLI & C. S.P.A.; PIRELLI TIRE LLC; BRIDGESTONE CORPORATION; BRIDGESTONE AMERICAS, INC.; AND DOES 1-100,

      Defendants.

**Case No.  5:24-cv-431**

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PARTIES ............................................................................................................................... 2

I.     PLAINTIFFS .................................................................................................... 2

II.    DEFENDANTS ................................................................................................ 3

III.   JURISDICTION AND VENUE ...................................................................... 12

IV.   AGENTS AND COCONSPIRATORS............................................................ 13

FACTS ................................................................................................................................. 14

I.     THE REPLACEMENT TIRE MARKET ....................................................... 14

     A.    Tire Prices in the United States Increased Dramatically After a Long Period of Relatively Stable Pricing............................................................. 16

     B.    Spring 2021 Price Increases................................................................ 17

     C.    Summer 2021 Price Increases.............................................................. 19

     D.    Fall 2021 Price Increases .................................................................... 20

     E.    January 2022 Price Increases .............................................................. 20

     F.    Spring 2022 Price Increases................................................................ 21

     G.   Summer and Fall 2022 Price Increases................................................ 22

     H.    2023 Increases..................................................................................... 23

     I.    Price Increase Factors ......................................................................... 24

II.    THE EC RAIDS.............................................................................................. 25

III.   THE RELEVANT MARKET ......................................................................... 26

IV.   FACTORS CORROBORATING DEFENDANTS' HORIZONTAL PRICE-FIXING AGREEMENT................................................................................... 28

     A.    Motive ................................................................................................. 28

     B.    Means and Opportunity........................................................................ 29

     C.    Market Factors .................................................................................... 30

          1.    Barriers to Entry ...................................................................... 30

          2.    Price Inelasticity for Tires Makes the Market Susceptible to Collusion .. 31

          3.    Tires are Standardized Products with a High Degree of Interchangeability ..................................................................... 32

     D.    Defendants Are Recidivist Violators of Antitrust Laws........................ 33

V.    TOLLING OF THE STATUTES OF LIMITATIONS .................................... 34

CLASS ACTION ALLEGATIONS .................................................................................... 35

REALLEGATION AND INCORPORATION BY REFERENCE ............................................ 40

CLAIMS FOR RELIEF ............................................................................................................. 41

PRAYER FOR RELIEF ........................................................................................................... 73

JURY DEMAND ....................................................................................................................... 73

## INTRODUCTION

1.      Plaintiffs Natalie Gianne and Karen Larson, on behalf of themselves and the putative classes, brings this case to seek redress for injuries suffered as a result of Defendants Continental Aktiengesellschaft; Continental Tire the Americas, LLC; Compagnie Générale des Établissements Michelin SCA; Michelin North America, Inc.; Nokian Tyres plc; Nokian Tyres Inc; Nokian Tyres U.S. Operations LLC; The Goodyear Tire & Rubber Company; Pirelli & C. S.p.A.; Pirelli Tire LLC; Bridgestone Corporation; Bridgestone Americas, Inc.; and unidentified Doe Defendants' (collectively, "Defendants") violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and consumer protection laws.

2.      On January 30, 2024, the European Commission ("EC"), in collaboration with national competition authorities from European Union ("EU") member states, carried out unannounced dawn raids on the premises of several tire companies, including the Defendant companies.[1] The EC stated that had concerns that "the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[2] Specifically, the EC stated that the inspections concerned new replacement tires for passenger cars, vans, trucks, and buses sold in the European Economic Area and possible price coordination between Defendants.[3] The price coordination was believed to have occurred at least in part via public communications.[4] These raids were a preliminary step in the EC's investigation into the suspected price coordination.[5]

3.      Evidence of Defendants' unlawful agreements to fix the prices of new replacement tires is supported by: (1) their sudden and dramatic price increases beginning in February 2021,

---

[1] https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.*

which was not economically rational unless they were involved in a conspiracy to fix prices; (2) the EC's raids; (3) the highly concentrated nature of the replacement tire market in the United States; (4) high barriers to entry in the replacement tire market; (5) the lack of substitutes for tires; (6) the standardization and thus interchangeability of tires; and (7) the motive and opportunity for Defendants to conspire with one another to fix the prices of tires.

PARTIES

## I.  PLAINTIFFs

4.  Plaintiff Natalie Gianne is a resident of Los Angeles, California. In January 2023, Ms. Gianne purchased two Michelin 235/45R18 98W Primacy MXM4 tires from American Tire Depot. In August 2023, Ms. Gianne purchased two Michelin tires from Lincoln Discount Tire in Venice, California.

5.  Plaintiff Karen Larson is a resident of Lisle, Illinois. In November 2021, Ms. Larson purchased four Michelin CrossClimate2 All Season Tires 215/55R16 tires from Costco.

6.  Plaintiffs paid prices for their tires that are higher than they would be absent Defendants' anticompetitive conduct described in this Complaint. Plaintiffs suffer other ongoing injuries from Defendants' anticompetitive conduct described in this Complaint, including diminished product quality and reduced consumer choice in the United States Replacement Tire Market—a market in which Plaintiffs are active consumers.

7.  Defendants' anticompetitive conduct remains in place and, absent an injunction, will continue to harm competition in the United States Replacement Tire Market by directly increasing prices; preventing price competition; strengthen barriers to entry; and reducing consumer choice.

## II.   DEFENDANTS

8.   **Continental**

a.   Defendant Continental Aktiengesellschaft ("Continental AG") is a German company with a principal place of business at Vahrenwalder Strasse 9, 30165 Hannover, Germany.

b.   Since January 1, 2022, Continental AG has structured its business into four group sectors: Automotive, Tires, ContiTech, and Contract Manufacturing.[6] According to Continental AG's 2022 Annual Report, the tires group generated €14 billion in sales and employed 56,987 people worldwide.[7] Continental AG's largest market is the United States, with 22% of Continental AG's sales in 2022 generated in the U.S., as compared to 18% in Germany, 12% in China and less than 10% in all other countries.[8]

c.   Continental AG's tires group is divided into five business areas, including Original Equipment, Replacement APAC, Replacement EMEA, Replacement the Americas and Specialty Tires.[9] 78% of Continental AG's sales in tires related to the tire-replacement business in 2022.[10]

d.   Continental AG has recognized that for the tires group sector, economies of scale play a key role in manufacturing.[11] For this reason, it has located its major

---

[6] Continental 2022 Annual Report, at 26,
https://cdn.continental.com/fileadmin/imported/sites/corporate/_international/english/hubpages/30_20investors/30_2
0reports/annual_20reports/downloads/continental_annual_report_2022.pdf?_gl=1*9f4olq*_ga*MTcxMDgzNzQ4Ni
4xNzA2NjMyMDgz*_ga_CXY4Q1X5YZ*MTcwNjcxNTA5MS4zLjEuMTcwNjcxNTI1NS4wLjAuMA.
[7] *Id.* at 3
[8] *Id.* at 122
[9] *Id.* at 75
[10] *Id.* at 27
[11] *Id.* at 28

manufacturing locations in the dominant automotive markets, namely Europe, the United States, and China.[12]

e.  Defendant Continental Tire the Americas, LLC ("Continental U.S.") is an Ohio Limited Liability Corporation with a principal place of business at 1830 Macmillan Park Drive, Fort Mill, South Carolina 29707.

f.  Continental U.S.'s Fort Mill headquarters with its over 500 employees is the operational hub for its tire business in the United States. From there, Continental U.S. oversees all its product lines including passenger, light truck, commercial, two-wheeler, and specialty tires.[13]

g.  Continental U.S. manufactures and distributes a complete line of passenger, light truck, and commercial tires for both the original equipment and replacement markets.[14] It sells its tires at independent tire dealers, car dealers, and mass retail companies across North America.[15]

h.  Continental U.S. manufactures tires in Mt. Vernon, Illinois, Sumter, South Carolina, and Clinton, Mississippi.[16] The Mt. Vernon plant is one of Continental's largest tire plants, with over 3,500 employees and it produces passenger and light truck tires, truck tires, and pre-cure tread.[17] The Sumpter plant produces passenger and light truck tires and has over 1,200 employees.[18] The Clinton, Mississippi plant opened in October 2019 and produces large truck

---

[12] *Id.*
[13] https://www.continental.com/en-us/career/our-locations/fort-mill/
[14] https://www.ustires.org/continental-tire-americas-llc
[15] *Id.*
[16] *Id.*
[17] https://www.continental.com/en-us/career/our-locations/mt-vernon/
[18] https://www.continental.com/en-us/career/our-locations/sumter/

and bus tires.[19] At full capacity, it is projected to produce an annual volume of 750,000 truck tires and create 2,500 job opportunities.[20] It currently employees over 400 people.[21]

9.   **Michelin**

a.   Defendant Compagnie Générale des Établissements Michelin SCA ("The Michelin Group") is a French company with a principal place of business at 23 Place des Carmes-Déchaux, 63000 Clermont-Ferrand, France. It is the parent company of the Michelin Group and directly or indirectly owns all of its subsidiaries.22

b.   The Michelin Group is composed of nine research and development centers, 123 production sites, a commercial presence in 170 countries, and 125,000 employees worldwide. In 2022, the Michelin Group generated €28,590 million in sales.

c.   The Michelin Group's principal subsidiaries are: (1) Manufacture Française des Pneumatiques Michelin ("MFPM"), a wholly owned subsidiary that coordinates all the Group's manufacturing, sales, and research operations in France and (2) Compagnie Financière Michelin ("CFM"), a wholly owned subsidiary that owns most of the Group's manufacturing, sales, and research companies outside of France and coordinates their operations.[23]

---

[19] https://www.continental.com/en-us/career/our-locations/clinton/
[20] *Id.*
[21] *Id.*
[22] Michelin 2022 Universal Registration Document, at 403
[23] Michelin 2022 Universal Registration Document, at 403

    d.   Defendant Michelin North America, Inc. ("Michelin") is a New York corporation with a principal place of business at One Parkway South, Greenville, South Carolina 29615-5022. Michelin designs, manufactures, and sells tires, including replacement tires for various types of vehicles.[24] It generated net sales in North America in 2022 of $10.920 billion.[25] Approximately 80% of these sales were generated in the United States.[26]

    e.   Michelin employs 23,000 people across 34 plants in the United States and Canada.[27] It has manufacturing facilities in Ohio, Oklahoma, Alabama, Kansas, New York, North Carolina, Tennessee, California, Georgia, Kentucky, Iowa, Pennsylvania, and Indiana.[28] Michelin Americas Research and Development Corporation, which research, develops, and tests Michelin tires, is located in its Greenville, South Carolina headquarters and nearby Laurens, South Carolina testing facility.[29]

10.   **Nokian Tyres**

    a.   Defendant Nokian Tyres plc is a Finnish company with its principal place of business at Pirkkalaistie 7, P.O. Box 20, 37101 Nokia, Finland. Nokian Tyres plc is the parent company of the Nokian Tyres Group, which includes subsidiaries worldwide.[30] The Nokian Tyres Group develops and manufactures tires for passenger cars, trucks, and heavy machinery.[31] Its tire plants are located

---

[24] https://www.ustires.org/michelin-north-america-inc
[25] Michelin 2022 Universal Registration Document, at 14
[26] *Id.*
[27] https://michelinmedia.com/site/user/files/1/MNA-Fact-Sheet-2023_2.pdf
[28] https://jobs.michelinman.com/recruitment-sites
[29] https://jobs.michelinman.com/recruitment-sites/greenville-sc-hna
[30] https://www.nokiantyres.com/company/about-us/
[31] *Id.*

in Dayton, Tennessee, Nokia, Finland, Vsevolozhsk, Russia.[32] Nokian Tyres Group is in the process of a controlled exit from Russia and investing in a new plant in Romania.[33]

b.  In 2022, the company's net sales were €1.776 billion, 18% of which was generated in the Americas.[34] At the end of 2022, Nokian Tyres Group employed 4,542 people, 458 of whom were located in North America.[35] It reports its American subsidiaries and sales on its annual report.[36]

c.  Nokian Tyres U.S. Holdings Inc. is a Delaware corporation with a principal place of business at 520 Nokian Tyres Drive, Dayton, Tennessee 37321. It is a wholly owned subsidiary of Nokian Tyres plc.

d.  Defendant Nokian Tyres Inc. is a Delaware corporation with a principal place of business at 520 Nokian Tyres Drive, Dayton, Tennessee 37321. It is a wholly owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.[37]

e.  Defendant Nokian Tyres U.S. Operations LLC is a Tennessee limited liability company a principal place of business at 520 Nokian Tyres Drive, Dayton, Tennessee 37321. It is a fully owned subsidiary of Nokian Tyres U.S. Holdings Inc., and an indirect subsidiary of Nokian Tyres plc.[38]

---

[32] https://www.nokiantyres.com/company/about-us/production/
[33] *Id.*
[34] Nokian 2022 Financial Review, at 8
[35] https://www.nokiantyres.com/company/sustainability/people/our-personnel-in-statistics/
[36] *See* Nokian 2022 Financial Review
[37] Nokian 2022 Financial Review, at 71
[38] Nokian 2022 Financial Review, at 71

f. In 2017, Nokian Tyres announced it had opened a $360-million manufacturing facility in Dayton, Tennessee.[39] The manufacturing facility produces North American-specific car and light truck all-season tires and all-weather tires.[40] The plant is capable of producing 4 million tires annually and has room to expand as needed. It also houses a distribution facility with storage capacity for 600,000 tires.[41] Commercial tire production began on the site in January 2020. Tires manufactured at Nokian's Dayton facility are distributed across the United States, including in Ohio.[42]

11. **Defendant The Goodyear Tire & Rubber Company** is an Ohio corporation with a principal place of business at 200 Innovation Way Akron, Ohio 44316-0001. Goodyear is one of the world's leading tire companies, with one of the most recognizable brand names.[43] It develops, manufactures, markets, and distributes tires as well as rubber-related chemicals.[44] In 2022, it generated $20.805 million in net sales companywide[45] and sold 62.3 million replacement tires in the United States.[46] In 2021, it sold 55.3 million replacement tires in the United States.[47]

12. Goodyear distributes its tires through a network of aligned dealers, wholesale distributors, and its own retail outlets and commercial truck centers.[48] Goodyear offers its products for sale, along with repair and other services, to consumer and commercial customers.[49] Goodyear manufactures its products in 57 facilities in 23 countries and has operations in most regions of the

---

[39] https://www.nokiantyres.com/daytonfactory/
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] Goodyear 2022 Annual Report
[44] *Id.*
[45] *Id.* at 1
[46] *Id.* at 9
[47] *Id.*
[48] Goodyear 2022 Annual Report
[49] *Id.*

world.[50] This includes its Akron, Ohio headquarters and innovation center.[51] It also manufactures

consumer tires in Ohio, Arkansas, Mississippi, North Carolina, and Oklahoma.[52] It has multiple

other manufacturing and testing facilities around the United States as well as an innovation lab in

San Francisco, California.[53]

13.     Goodyear manufactures and sells under the Goodyear, Cooper, Dunlop, Kelly,

Debica, Sava, Fulda, Mastercraft, and Roadmaster brands. [54]

14.     Approximately 86% of Goodyear's sales in 2022, 85% in 2021, and 84% in 2020

were for tire units.[55] The principal channel for the sale of Goodyear- and Cooper-brand tires in

Americas is through Goodyear's network of independent dealers.[56] Goodyear, Cooper, Dunlop,

Kelly, and Mastercraft brand tires are also sold to numerous national and regional retailers, in

Goodyear company-owned stores in the United States, and through the wholesale channel,

including through TireHub, LLC, Goodyear's national wholesale tire distributor in the United

States, and a network of aligned U.S. regional wholesale tire distributors.[57]

15.     **Pirelli**

    a.  Defendant Pirelli & C. S.p.A. is an Italian company with a principal place of

        business at Via Bicocca degli Arcimboldi, 3, 20126 Milano MI, Italy. Pirelli

        designs, manufactures, and distributes tires for cars, motorcycles, and

        bicycles.[58] It focuses on a premium product segment.[59] Pirelli has a commercial

---

[50] *Id.*
[51] *Id.*
[52] *Id.* at 95
[53] *Id.*
[54] *Id.* at 91
[55] *Id.*
[56] Goodyear 2022 Form 10-K,  at 3
[57] *Id.*
[58] https://www.ustires.org/pirelli-tire-llc
[59] *Id.*

presence in over 160 countries and 19 manufacturing sites in 12 countries.[60] In 2022, its net sales were €6,616 million.[61]

b. Defendant Pirelli Tire LLC is a Delaware limited liability company with its principal place of business at 100 Pirelli Drive, Rome, Georgia 30161. At its headquarters, Pirelli Tire LLC also has a research and development center.[62] Its United States sales and marketing offices are located in in New York City, Los Angeles, Detroit, and Atlanta.[63] Pirelli also has a flagship store in Los Angeles, California.[64] The company manufactures, distributes, and markets both original equipment and replacement tires for export and domestic car/motorcycle applications across the United States, including in Ohio.[65]

16. **Bridgestone**

a. Defendant Bridgestone Corporation is organized under the laws of Japan with its principal place of business at 1-1, Kyobashi 3-chome, Chuo-ku, Tokyo 104-8340. It is the parent corporation of the Bridgestone Group, which includes Bridgestone Americas, Bridgestone China, Asia Pacific, Bridgestone Europe, Russia, Middle East, India, and Africa, and Bridgestone Japan.[66] Bridgestone Corporation is the world's largest tire and rubber company.[67]

---

[60] *Id.*
[61] https://corporate.pirelli.com/corporate/en-ww/investors/key-financials/financial-highlights
[62] https://press.pirelli.com/mirs-factory-officially-opens-in-north-america/
[63] https://www.ustires.org/pirelli-tire-llc
[64] *Id.*
[65] *Id.*
[66] Bridgestone 2023 Integrated Report, at 3
[67] https://www.bridgestonetire.com/about-bridgestone/who-we-are/#:~:text=About%20Bridgestone&text=The%20two%20companies%20merged%20in,largest%20tire%20and%20rubber%20company.

b. The Bridgestone Group maintains research and development facilities in in the United States in Akron, Ohio, Columbiana, Ohio, and Fort Stockton, Texas.[68] Its regional head office is located in Tennessee.[69] The Bridgestone Group's revenue in 2022 derived from operations in the Americas was ¥1.988 billion, which was about 46% of its overall revenue.[70] 32% of its tire volume production occurred in the Americas as well in 2022.[71] In 2022, Bridgestone Group had 129,260 employees total with 50,198, or 40%, of those located in the Americas.[72]

c. Its core business involves manufacturing tires and tubes for passenger cars, trucks, buses, aircraft, construction and off-road mining vehicles, industrial and agricultural machinery, motorcycles, scooters, and other vehicles as well as automotive parts, automotive maintenance and repair services, raw materials for tires and other products.[73]

d. Defendant Bridgestone Americas, Inc. ("BSAM") is incorporated under the laws of Nevada with its principal place of business at 200 4th Ave, Suite 100, Nashville, Tennessee 37201-2256. BSAM and its subsidiaries develop, manufacture, and market a wide range of branded tires including Bridgestone and Firestone.[74] These tires are created to address the needs of a broad range of

---

[68] https://www.bridgestone.com/corporate/locations/rd/
[69] https://www.bridgestone.com/corporate/locations/hq/
[70] Bridgestone 2023 Integrated Report, at 7
[71] *Id.*
[72] *Id.*
[73] *Id.* at 6
[74] https://www.bridgestoneamericas.com/en/company/businesses/products

11

customers, including automotive and commercial vehicle original equipment manufacturers and those in the agricultural, forestry and mining industries.[75]

e.  BSAM has U.S. manufacturing facilities in Ohio, South Carolina, Arkansas, Georgia, Iowa, Illinois, North Carolina, Tennessee, and Texas and distribution facilities in Pennsylvania, Florida, Hawaii, Oregon, Tennessee, Texas, and Illinois.[76]

17.  Doe Defendants 1–100 are other individuals or entities who engaged in or abetted Defendants in the unlawful conduct set forth in this Complaint. Plaintiffs may amend this Complaint to allege the names of additional Defendants as they are discovered.

## III.  JURISDICTION AND VENUE

18.  The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337(a), and 1367. The Court has jurisdiction over Plaintiffs' claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

19.  This Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction, and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants within this jurisdiction.

20.  Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District. Defendant The Goodyear Tire & Rubber Company at all relevant times maintained a principal

---

[75] https://www.ustires.org/bridgestone-americas-inc
[76] *Id.*

place of business in this division in Akron, Ohio, where it also conducts business relating to the events alleged.

21.     Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

22.     During the Class Period, Defendants manufactured, sold, and shipped tires in a continuous and uninterrupted flow of interstate commerce, which included sales of tires in this District, advertisement of tires in media in this District, and employment of sales personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

## IV.     AGENTS AND COCONSPIRATORS

23.     Defendants' anticompetitive and unlawful acts alleged in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

24.     Each of Defendants' corporate agents operated under the authority and apparent authority of their respective principals.

25.     Each of Defendants' corporate agents, through their respective subsidiaries, affiliates, and agents, operated as a single unified entity.

26.     Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged and may have performed acts and made statements in furtherance thereof.

27.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

28.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employee or agent of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant's companies within that family. Furthermore, to the extent that subsidiaries within corporate families distributed the tire products discussed in this Complaint, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices paid for such products would not undercut their pricing agreements. Thus, all entities within Defendants' corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices.

## FACTS

## I.     The Replacement Tire Market

29.     Tires are a critical component of the U.S. automotive industry overall. There are nearly 9.2 million passenger and commercial vehicles being produced and almost 14 million vehicles sold in the United States in 2022.[77] For these reasons, the U.S. market requires a large number of tires to be manufactured annually.[78]

30.     Because of this, automobile tire manufacturers have existed in the United States almost as long as there have been cars. For example, Defendant Goodyear began producing automobile tires in 1899, around the time automobiles were becoming commercially available.[79]

---

[77] https://www.statista.com/topics/3769/tire-market-in-the-us/#topicOverview
[78] *Id.*
[79] https://corporate.goodyear.com/us/en/about/history.html

31.     The replacement tire market is big business in the United States. In 2022, there were some 283.4 million vehicles registered in the U.S. On average, tires on these vehicles must be replaced every six years on average.

32.     The United States Tire Manufacturers Association ("USTMA") projects total U.S. tire shipments of 334.2 million units in 2023, compared to 332.0 million units in 2022 and 332.7 million units in 2019. In 2022, the market for replacement tires in the United States was sized at approximately $61 billion.

33.     Tires are either manufactured for use in new cars ("Original Equipment Tires" or "OE" tires) or produced as replacement tires ("Dedicated Replacement Tires").[80]

34.     OE tires are those tires typically specified by the vehicle manufacturer and are initially fitted to a new vehicle.[81] Car manufacturers and tire companies work together to choose a tire that will meet the manufacturer's performance requirements for their brand-new vehicle.[82] The manufacturer selects a tire that balances ride noise, handling, longevity, and fuel efficiency to achieve the overall characteristics that the manufacturer believes are important to the consumer.[83] Consumers can also buy OE tires when their first set wears out. However, they may also elect to replace their OE tires with Dedicated Replacement Tires.[84]

35.     In contrast, Dedicated Replacement Tires are designed for all-around performance on any vehicle they are sized and rated to fit.[85] They often place special emphasis on one or two performance attributes that research has identified to be especially important to consumers (such as tread life, traction, or ride comfort).[86] This gives the consumer the option of customizing the

---

[80] https://www.goodyear.com/en_US/learn/choosing-your-tires/oem-vs-replacement-tires.html
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*

vehicle to suit their needs and driving habits.[87] Dedicated Replacement Tires are often selected by individual consumers either at the end of their OE tire's life or when consumers find their OE tires are not appropriate for their needs.[88]

**A.      Tire Prices in the United States Increased Dramatically After a Long Period of Relatively Stable Pricing**

36.      For most of the 2010s, the price level of tires was stable, changing only by small amounts slowly.[89] Over the last four years, however, the prices of tires have seen dramatic increases, driven by lockstep price increases from the major U.S. tire manufacturers.[90]



----

[87] *Id.*
[88] *Id.*
[89] https://fred.stlouisfed.org/series/PCU32621132621103
[90] *Id.*

37.     As shown by the following table, each Defendant increased their prices of passenger and light truck replacement tires in lockstep between 2021 and 2023:

| Defendant | Effective Date | Price Increase |
|---|---|---|
| Michelin | February 1, 2021 | Up to 5% |
| Continental | March 1, 2021 | Undisclosed |
| Michelin | April 1, 2021 | Up to 8% |
| Goodyear | April 1, 2021 | Up to 8% |
| Pirelli | April 15, 2021 | Up to 7% |
| Bridgestone | May 1, 2021 | Up to 8% |
| Goodyear | June 1, 2021 | Up to 8% |
| Michelin | July 1, 2021 | Up to 6% |
| Continental | July 1, 2021 | Undisclosed |
| Pirelli | July 1, 2021 | Up to 6% |
| Goodyear | September 1, 2021 | Up to 8% |
| Michelin | September 1, 2021 | Up to 14% |
| Continental | October 1, 2021 | Undisclosed |
| Pirelli | October 1, 2021 | Up to 8% |
| Michelin | January 1, 2022 | Up to 12% |
| Goodyear | January 1, 2022 | Up to 12% |
| Continental | January 3, 2022 | Undisclosed |
| Pirelli | January 17, 2022 | Up to 10% |
| Continental | April 1, 2022 | Undisclosed |
| Michelin | April 1, 2022 | Up to 5% |
| Bridgestone | April 1, 2022 | Up to 10% |
| Pirelli | April 11, 2022 | Up to 10% |
| Continental | June 1, 2022 | Undisclosed |
| Michelin | June 1, 2022 | 5-12% |
| Pirelli | June 15, 2022 | Up to 10% |
| Goodyear | July 1, 2022 | Up to 10% |
| Bridgestone | July 1, 2022 | Up to 10% |
| Bridgestone | October 1, 2022 | Up to 9% |
| Michelin | January 1, 2023 | Up to 9% |
| Bridgestone | January 1, 2023 | Undisclosed |
| Pirelli | January 15, 2023 | Up to 10% |

38.     Each of these price increases was reported on by industry media.

**B.      Spring 2021 Price Increases**

39.     On December 18, 2020, Michelin posted an announcement on its website that effective February 1, 2021, it was increasing prices on select Michelin- and BFGoodrich-brand

17

passenger and light truck tires, as well as on select commercial truck tires, up to 5% "due to changing business dynamics of the U.S. market."[91] It had earlier increased the prices on its Uniroyal line of passenger and light truck products.[92]

40.     Less than a month after Michelin's announcement, Continental announced that it would be increasing prices on select passenger and light truck tires in the U.S. within the Continental and General brands by some undisclosed amount, effective March 1, 2021.[93]

41.     On March 1, 2021, Michelin announced another price increase of up to 8% on select Michelin, BFGoodrich, and Uniroyal passenger and light truck tires, which would go into effect on April 1, 2021.[94] Again, it cited "changing business dynamics and rising costs of raw materials."[95] A few days later, Goodyear also announced that it would effectuate a price increase on its Goodyear, Dunlop and Kelly-brand consumer tires for up to 8% on April 1, 2021.[96] Echoing Michelin, it stated the increases were "in response to changing market dynamics in the industry."[97]

42.     Pirelli was next, announcing just days later on March 9 that it would also implement a price increase, effective on April 15, 2021.[98] Pirelli's April price increase on passenger and light truck tires in the United States was for up to 7%, and the company cited the "higher price of raw materials and changing market conditions" as the rationale for the increase.[99]

---

[91] https://www.moderntiredealer.com/topic-category/topics/article/11475158/michelin-will-raise- consumer-commercial-prices-on-feb-1-2020-12-19
[92] *Id.*
[93] https://www.moderntiredealer.com/topics/industry-news/article/11474953/continental-plans- price-hike-on-plt-tires-2021-01-06
[94] https://www.moderntiredealer.com/topic-category/topics/article/11473824/michelin-will-raise-consumer-tire-prices-on-april-1-2021-03-01
[95] *Id.*
[96] 42 https://www.moderntiredealer.com/topics/industry-news/article/11473768/goodyear-to- increase-consumer-tire-prices-2021-03-03
[97] *Id.*
[98] https://www.moderntiredealer.com/topic-category/topics/article/11473594/pirelli-will-raise- prices-in-us-on-april-15-2021-03-09
[99] *Id.*

43.     Bridgestone waited longer, but by the end of March had announced an up to 8% price increase on select Bridgestone and Firestone brand passenger and light truck tires up to 8% in the United States and Canada due to "increased business costs and other market dynamics."[100] The increase was slated to become effective on May 1, 2021.[101]

### C.     Summer 2021 Price Increases

44.     The next round of price increases began on May 3, 2021, with Goodyear announcing increases on Goodyear, Dunlop, and Kelly consumer tires by up to 8% effective June 1, 2021.[102] Goodyear claimed the increase was due to "changing market dynamics in the industry" again, using the same wording from its April 1, 2021, price increase.[103]

45.     Two days later, on May 5, 2021, Continental announced it would also be implementing a price increase on July 1, 2021, on select Continental- and General-brand passenger and light truck tires by an undisclosed amount.[104]

46.     This was followed by Michelin announcing a price increase, which would go into effect on July 1, by up to 6% on certain aftermarket Michelin, BFGoodrich, and Uniroyal passenger and light truck tires on May 17, 2021.[105] The Michelin price hikes were attributed to market dynamics.[106]

---

[100] https://www.moderntiredealer.com/site-placement/featured-stories/article/11473222/bridgestone-to-raise-consumer-tire-prices-on-may-1-2021-03-24
[101] Id.
[102] https://www.moderntiredealer.com/topics/industry-news/article/11472039/goodyear-plans- another-consumer-tire-price-hike
[103] Id.
[104] https://www.moderntiredealer.com/topic-category/topics/article/11471940/continental-will- raise-consumer-tire-prices-in-july-1-2021-05-05
[105] https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301292713.html
[106] Id.

47.     The next day, Pirelli announced a price increase by 6% on passenger and light truck tires also to go into effect on July 1, 2021.[107] The increases were blamed on higher prices of raw materials and changing market conditions.[108]

### D.     Fall 2021 Price Increases

48.     On August 3, 2021, Michelin announced that effective September 1, 2021, it would increase prices on certain aftermarket Michelin, BFGoodrich, and Uniroyal passenger and light truck tires by up to 14%, citing market dynamics.[109] A week later, on August 10, 2021, Goodyear told investors on an earnings call that it would implement price increases on consumer tires by up to 8%.[110]

49.     The next price increases came later that month. On August 30, 2021, Continental announced price increases on some Continental and General passenger and light truck tires by an undisclosed amount, which would become effective on October 1, 2021.[111] The next day, Pirelli also announced an increase in prices on car and light truck tires by up to 8%, citing higher prices of raw materials and changing market conditions.[112]

### E.     January 2022 Price Increases

50.     Late 2021 came with another rash of price increases, which went into effect in January 2022.

---

[107] https://www.moderntiredealer.com/topics/industry-news/article/11471596/pirelli-plans-another-price-hike
[108] *Id.*
[109] https://www.tyrepress.com/2021/08/michelin-announces-north-america-price-increases/
[110] https://www.ratchetandwrench.com/topics/news/article/11463860/goodyear-and-cooper-consumer-tire-prices-are-going-up-modern-tire-dealer
[111] https://www.tirereview.com/continental-tire-announces-price-increase/
[112] https://www.rubbernews.com/tire/pirelli-raising-us-tire-prices-oct-1

51.     On November 9, 2021, Continental announced price increases on select Continental and General passenger and light truck tires by an undisclosed amount that would go into effect on January 3, 2022.[113]

52.     Less than a month later, December 1, 2021, Michelin implemented price increases up to 12% on select Michelin, BFGoodrich, and Uniroyal passenger and light truck replacement tires. These went into effect on January 1, 2022.[114]

53.     Around this time, Goodyear also announced that it would be raising its prices on consumer tires by up to 12% effective January 1, 2022.[115]

54.     On January 3, 2022, Pirelli also announced it would be increasing its prices in the United States for car and light truck tires by up to 10%, effective January 17, 2022.[116] Pirelli cited changing market conditions are the reason for the increases.[117]

**F.     Spring 2022 Price Increases**

55.     On March 1, 2022, Continental and Michelin announced yet another increase in tire prices, which would go into effect on April 1, 2022. Continental did not disclose the amount of the increase on select Continental and General passenger and light truck tires.[118] Michelin raised the prices of select passenger and light truck replacement tires by 5%.[119]

---

[113] https://www.tirereview.com/continental-tire-announces-price-increase-2/
[114] https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across- passenger-brands-and-commercial-offers-in-north-american-market-301435108.html
[115] https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1
[116] https://www.tirereview.com/pirelli-price-increases/2
[117] *Id.*
[118] https://www.tirereview.com/continental-tire-announces-price-increase-3/
[119] https://michelinmedia.com/pages/blog/detail/article/c/a1155/#:~:text=Tread%20rubber%20and%20associated%20supplies,2%2C%202022

56.     The next day, on March 2, 2022, Bridgestone announced its plan to increase prices by up to 10% on non-winter Bridgestone, Firestone, and Fuzion passenger and light truck replacement tires effective April 1, 2022.[120]

57.     Pirelli was next with a March 23, 2022, announcement that, effective April 11, 2022, it would be increasing its prices on car and light truck tires by up to 10% due to changing market conditions.[121]

**G.     Summer and Fall 2022 Price Increases**

58.     Shortly after its spring increases, on April 19, 2022, Continental announced it would be raising prices again effective June 1, 2022.[122] These increases again would impact Continental- and General-branded passenger and light truck tires by an undisclosed amount.[123]

59.     Michelin followed suit less than a month later on May 11, 2022, when it announced it would increase prices on the majority of its passenger and light truck replacement tires ranging from 5-12% effective June 1, 2022.[124]

60.     Just 6 days later, Pirelli announced yet another increase on U.S. car and light truck tires, effective June 15, 2022. It again claimed that market conditions were the cause.[125]

61.     On June 6, 2022, shortly after the Continental and Michelin price increases went into effect, Bridgestone announced it would be increasing prices on consumer tires by up to 10%, effective July 1, 2022.[126] The company stated that this was a necessary step to navigate the market dynamics.[127]

---

[120]  https://www.tirereview.com/bridgestone-price-increase-2/
[121] https://www.tirereview.com/pirelli-increases-price-for-tires/
[122] https://www.tirebusiness.com/news/conti-raise-us-tire-prices-june-1
[123] *Id.*
[124] https://www.tirereview.com/michelin-price-increase/
[125] https://www.tirereview.com/pirelli-increase-prices-plt-tires/
[126] https://www.tirereview.com/bridgestone-increase-prices/
[127] *Id.*

62.     Less than ten days later, on June 15, 2022, Goodyear similarly announced an increase of up to 10% effective July 1, 2022, on its Goodyear- and Cooper-brand consumer tires.[128] Its chief financial officer cited rising raw materials and other inflation-impacted costs for the need to raise prices.[129]

63.     Bridgestone also increased its prices again on Bridgestone, Firestone, and Fuzion passenger and light truck tires by up to 9% effective October 1, 2022.[130]

### H.     2023 Increases

64.     Pirelli made the first announcement of a 2023 increase on December 12, 2022.[131] It stated that effective January 15, 2023, it would increase the prices for car and light truck tires by up to 10%.[132]

65.     The next day, on December 13, 2022, Michelin announced another price increase, this one effective January 1, 2023, which would increase prices on select passenger and light trucks tires by up to 9%.[133]

66.     Bridgestone also made an announcement on December 13 that it would impose a price increase in an undisclosed amount on passenger and light truck replacement tires effective January 1, 2023.[134]

---

[128] https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1
[129] *Id.*
[130] https://www.tirereview.com/bridgestone-price-increase-3/
[131] https://www.tirereview.com/pirelli-increase-prices-tires/
[132] *Id.*
[133] https://www.tirereview.com/michelin-price-increases/
[134] https://www.tirereview.com/bridgestone-americas-increased-prices/

## I.      Price Increase Factors

67.     Between 2021 and 2023, the average price of tires rose 21.4%.[135] This means that the rate of increase for tires was 70% higher than core inflation.[136] These prices have remained high even while inflation eased and the effects of the COVID-19 pandemic dissipated.[137]

68.     Even with the increased costs associated with the pandemic, Defendants' price increases have been disproportionate. For example, in its Q1 2022 earnings call on May 6, 2022, Goodyear's chief financial officer made the point to investors a half-dozen times that Goodyear's "increase in the replacement tire prices more than offset our costs."[138]

69.     Defendants also did not suffer a decline in sales volume due to price increases, which would normally be seen in a price-competitive market.[139] For example, Continental's sales volume rose by 19.3% in 2022.[140] Their annual report from that year indicates that "agreements reached with customers on price adjustments and to offset inflation-related effects had a positive impact on the sales performance of the Automotive group sector."[141]

70.     This is in part due to the current structure of tire manufacturing.[142] Decades ago, tires generally came in a few dozen standard sizes.[143] But as automakers began to demand OE tires that were specialized to the vehicles they were designing, the number of tire sizes increased. As of May 1, 2023, Michelin listed 432 different sizes on its website.[144]

---

[135] https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices
[136] *Id.*
[137] *Id.*
[138] https://news.alphastreet.com/the-goodyear-tire-rubber-company-gt-q1-2022-earnings-call- transcript/
[139] *Id.*
[140] Continental 2022 Annual Report
[141] Continental 2022 Annual Report, at 73
[142]  https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices
[143] *Id.*
[144] *Id.*

71.     This increase in options would presumably have given buyers more choice.[145] However, tire dealers now must carry so many sizes that they generally only have a few brands in stock and consumers tend to purchase those few that have name recognition, like those sold by Defendants.[146]

72.     The inelasticity of demand for tires is exacerbated by the fact that a tire purchase only occurs for most consumers every six years or so.[147] As a former executive at Goodyear and Pirelli put it, "Consumers don't really have a frame of reference on what a tire should cost, because you only buy them every few years."[148]

73.     These factors mean that although prices have been increasing since 2021, consumers have continued to buy.[149]

## II.     The EC Raids

74.     The European Commission acts as the competition enforcer in the 27-country European Union bloc. On January 30, 2024, the EC, in collaboration with national competition authorities from EU member states, carried out unannounced inspections of the premises of several tire companies, including the Defendant companies.[150]

75.     Defendants Goodyear, Bridgestone, Pirelli, Continental, Michelin, and Nokian confirmed that the raids occurred.[151]

---

[145] *Id.*
[146] *Id.*
[147] https://www.caranddriver.com/news/a15339994/how-long-should-a-new-set-of-tires-last/
[148] https://www.propublica.org/article/inflation-tires-rubber-imports-high-prices
[149] *Id.*
[150] https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561
[151] https://www.euractiv.com/section/competition/news/eu-raids-target-top-tyre-firms-over-suspected-cartel/; https://www.reuters.com/business/autos-transportation/eu-antitrust-regulators-raid-tyre-makers-concerns-about-possible-cartel-2024-01-30/

76.     The EC expressed concern that "the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices."[152]  Specifically, the EC stated that the inspections concerned new replacement tires for passenger cars, vans, trucks, and buses sold in the European Economic Area and possible price coordination between Defendants.[153]  The price coordination was believed to have occurred at least in part via public communications.[154]  These raids were a preliminary step in the EC's investigation into the suspected price coordination.[155]

## III.     The Relevant Market

77.     Defendants make up some of the largest tire manufacturers in the United States Replacement Tire Market. Goodyear employs about 72,000 people and manufactures its products in 57 facilities in 23 countries around the world.[156]  Bridgestone is the world's largest tire and rubber company, with about 130 manufacturing plants and R&D facilities in 25 countries and sells products in more than 150 countries worldwide.[157]  Michelin has nine R&D centers around the world, 123 production sites in 26 countries, a commercial presence in 170 countries and 125,000 employees worldwide, and does business on every continent.[158]  Pirelli has 18 factories located in 12 countries, production capacity in 2022 of 74 million car tires, and points of sale in over 160 countries (around 20,000 in 2022).[159]  Continental employs almost 200,000 people at 519 locations for production, research, and development, and is present in 57 countries and markets. It has 917

---

[152] https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561
[153] https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561
[154] https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561
[155] https://ec.europa.eu/commission/presscorner/detail/en/ip_24_561
[156] https://corporate.goodyear.com/us/en/about.html
[157] https://www.bridgestone.com/corporate/
[158] https://www.michelin.com/en/michelin-group/about-us/global-footprint/
[159] https://corporate.pirelli.com/corporate/en-ww/aboutus/pirelli-in-brief

company-owned tire outlets and a total of around 5,228 franchises and operations with a Continental brand presence.[160]

78.     The United States Replacement Tire Market is oligopolistic, with three of the Defendants controlling the lion's share of the market: in 2022, Defendants Goodyear, Bridgestone, and Michelin made up almost 64 percent of the entire replacement tire market.[161] Each of the Big Three also encompasses subsidiary brands: (i) Goodyear: Goodyear, Cooper Tires, Dunlop, and Kelly, (ii) Bridgestone: Bridgestone and Firestone, (iii) Michelin: Michelin, BF Goodrich, and Uniroyal.[162]

79.     The remaining 36 percent of the market includes manufacturers such as Continental and Nokian.[163]



**Tire Market Share**

---

[160] Continental 2022 Annual Report, at 26
[161] https://www.traqline.com/newsroom/blog/the-goliaths-of-the-replacement-tire-industry-are-getting-bigger-how-can-the-davids-compete/
[162] *Id.*
[163] *Id.*

80.     This concentration, with 64% of the market controlled by three manufacturers, makes the United State Replacement Tire Market susceptible to cartelization. This is because a smaller group of competitors is better able to solve the coordination and trust problems that can prevent cartel formation or destabilize an existing cartel. Further, a smaller number of negotiators makes it easier for the conspirators to agree on a cartel price, to allocate market shares, to conceal their collusion, to develop enforcement mechanisms, and to detect and punish cheaters.

## IV.      Factors Corroborating Defendants' Horizontal Price-Fixing Agreement

81.     In addition to lockstep price increases, a European Commission investigation, and a consolidated industry susceptible to collusion, Defendants' unlawful agreement to fix prices of tires is supported by (i) motive and (ii) means and opportunity, in a market that is (iii) concentrated with (iv) high barriers to entry, (v) price inelasticity, and (vi) interchangeable products. Defendants are also recidivist bad actors who hid their actions, evidencing a consciousness of guilt.

### A.      Motive

82.     Leading up to the COVID-19 pandemic, vehicle miles in the Unites States were steadily rising and were coupled with low-priced rubber, which created healthier operating conditions for tire manufacturers. However, as the pandemic took hold, measures were put into place to combat the spread of the virus that stopped domestic travel for a period of time, followed by a long period of much slower travel than prior to the pandemic. This reduced the demand for tires.

83.     At the same time, the supply chain struggled. Even after the COVID-19 pandemic subsided, there were lasting effects to the supply chain that increased the costs related to logistics and raw materials. This caused tire manufacturers' profits to shrink as revenue was reduced but the costs of goods sold increased.

84.     Investors took note. For example, in February 2022, Goodyear's stock price dropped 25% in one day.[164] Goodyear's stock dropped again in November 2022, this time by 10%.[165]

85.     To remain profitable, Defendants decided to pass on these costs to consumers.

86.     However, by 2023, inflation had eased and supply chain logistics had recovered. Despite this, tire prices remained high even as there was excess supply. For example, in November 2023, the president of the union at the Bridgestone Americas Inc. tire plant in Morrison, Tennessee stated that "[e]ven with [] lower production levels, we still have huge amounts of inventory — more than our warehouse can handle. Our warehouse is full of truck and bus tires. In addition, we have 150 to 175 trailers on our plant's property that are completely full of tires."[166]

87.     In a market without anticompetitive behavior from its participants, as costs lowered and there was excess supply, prices would lower too, as inflated prices would lead to a loss of market share. Yet prices remain high for all major tire manufacturers.

**B.     Means and Opportunity**

88.     Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. At least throughout the Class Period, the tire industry provided ample opportunities for Defendants and/or their parent companies to collude and fix the prices of tires, through trade association meetings and public communications.

---

[164] https://www.barrons.com/articles/goodyear-stock-price-earnings-inflation-pressures-51644599253
[165] https://www.marketwatch.com/story/goodyear-stock-drops-to-lowest-level-in-a-month-as-sales-volumes-worry-wall-street-11667317266
[166] https://www.moderntiredealer.com/suppliers/article/33014539/do-tire-tiers-exist-and-are-they-competitive

89. For example, each of the Defendants is a member of the USTMA. The USTMA is the national trade association for tire manufacturers that produce tires in the United States. Senior executives from each of the Defendants currently serve on the Board of Directors of the USTMA.

90. The USTMA holds a number of annual conferences and meetings where Defendants had the opportunity to meet and discuss pricing. For example, the USTMA holds a spring and fall meeting for its board members annually, including on July 29, 2020,[167] October 6, 2021,[168] January 25, 2022,[169] October 6, 2022,[170] April 3–4, 2023,[171] and October 11, 2023.[172] Minutes from these regular meetings are not available to the public.

### C. Market Factors

#### 1. Barriers to Entry

91. Tire manufacturers face significant entry and exit barriers that lead to market concentration, which facilitates collusion in the United States Replacement Tire Market.

92. These barriers to entry include large up-front capital investments to establish manufacturing plants that can produce tires at scale. For example, Defendant Nokian recently completed a $360-million manufacturing facility in Dayton, Tennessee.[173] Tire manufacturing plants need to be close enough to the end consumers to ensure that shipping costs are not prohibitive. Manufacturing plants must also opt to either have sophisticated automation or a large labor force. Both options are expensive.

---

[167] https://www.tiretechnologyinternational.com/news/business/ustma-makes-changes-to-its- director-board.html
[168] https://www.ustires.org/us-tire-manufacturers-association-names-bridgestones-paolo-ferrari- board-chair
[169] https://www.moderntiredealer.com/retail/article/11466086/ustma-announces-four-new-board- members
[170] https://www.ustires.org/us-tire-manufacturers-association-names-bridgestones-paolo-ferrari- board-chair
[171] https://www.ustires.org/ustma-board-directors-holds-spring-meeting-washington-dc-admits- giti-tire-usa-12th-member-company
[172] https://www.moderntiredealer.com/suppliers/article/33013078/michelin-ceo-named-ustma- chairman
[173] https://www.nokiantires.com/daytonfactory/

93.     Further, because established tire manufacturers have patented their products, a new entrant would face hurdles in overcoming these significant intellectual-property protections.

94.     Moreover, because such huge investments are required to set up a manufacturing plant, it is extremely difficult to exit from the tire industry. Some companies, like Uniroyal and Goodrich, had to merge due to high exit barriers. This creates conditions where consolidation is more likely to occur than companies going out of business.

95.     Because the replacement tire market has high barriers to entry, it is more conducive to collusion. To maximize long-term profits, the cartel-fixed price must be sufficiently high to warrant participation in a criminal conspiracy but not so high as to lure new competitors into the market. When a market is protected by high barriers to entry, conspirators are better able to fix a high price with less worry that new firms will come into the market and bid the price down. In contrast, firms may not bother to conspire to fix prices if interlopers cannot be excluded from the market.

### 2.      Price Inelasticity for Tires Makes the Market Susceptible to Collusion

96.     The price elasticity of demand shows the responsiveness of the quantity demanded of a good relative to a change in its price. When a seller of goods or services can increase its price without suffering a substantial reduction in demand, pricing is considered inelastic. For example, prescription drugs have little price elasticity of demand. People who need their prescriptions will continue to buy as much as they have to even as the price increases.

97.     The relative price elasticity of demand affects whether price-fixing is likely to be profitable for that good. When demand is inelastic, a seller with market power can charge a higher price without losing significant sales. Inelastic demand also encourages collusion because rivals can collectively raise prices profitably.

98.     Tires are highly inelastic because tire replacement is not an option that can be deferred for long, particularly when a tire is damaged. Further, the cost of replacement tires makes up a small percentage of the operating cost of a car. And tires do not compete with other products in the functional sense; consequently, there is no inter-industry competition through cross-elasticities of demand. Since the demand for tires is derived from the need to use the automobile, buyers cannot be induced to buy more or less of the product in any significant sense through price changes.

99.     Because the price for tires is highly inelastic, Defendants were able to and did collectively raise prices to supracompetitive levels without losing revenue. For example, Bridgestone America's chief operating officer reported, "We're certainly seeing a red-hot economy that, despite the price increases and inflation, demand still remains quite strong."[174]

### 3.     Tires are Standardized Products with a High Degree of Interchangeability

100.    Defendants make similar models of tires for each of the type-categories listed above (all-season, all-terrain, winter/snow, and summer tires). Within each type-category, tires do not differ significantly in quality, appearance, or use. As a result, tire models are functionally interchangeable.

101.    When purchasing a new set of replacement tires, consumers can choose almost any brand on the market. Even when consumers are replacing only some of the four tires on their vehicle, they can use tires from different brands or models so long as certain features, such as tread

---

[174] https://www.tirebusiness.com/news/rising-tire-prices-affected-several-factors

depth, are similar.[175] Thus, tire "producers are not likely to be able to deviate much from the competitive price without losing sales."[176]

102.     When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where a product like a tire is interchangeable, economics suggests that cartel behavior is facilitated because cartel members can more easily monitor and detect defections from a price-fixing agreement.

### D.     Defendants Are Recidivist Violators of Antitrust Laws

103.     The U.S. tire industry for years has been highly concentrated, and there is a history of antitrust violations by tire manufacturers.

104.     In 2008, the South African Competition Authority conducted search and seizure operations at the premises of Bridgestone, Dunlop, and the South African Tyre Manufacturers' Conference.[177] These raids resulted in South African's competition authority issuing fines against Goodyear and Continental, while Bridgestone South Africa (Pty) Ltd. escaped a fine after admitting to taking part in the alleged cartel and receiving conditional immunity after filing a leniency application with the regulator.[178]

105.     In 2019, Defendants Bridgestone and Continental were among the 52 automotive suppliers that paid a total of $23 million in settlements for antitrust law violations brought by the California Attorney General.[179]

---

[175] https://www.prioritytire.com/blog/should-you-be-mixing-tire-brands-on-the-same-vehicle/
[176] Economic Analysis of the Rubber Tire Manufacturing MACT, U.S. Environmental Protection Agency (August 2000), at 2-13, https://www.epa.gov/sites/default/files/2020-07/documents/rubber-tire-mfg_ip_08-2000.pdf.
[177] https://irglobal.com/article/tyresome-collusion-tribunal-hearing-into-alleged-tyre-cartel/
[178] https://www.law360.com/articles/192122/s-africa-targets-goodyear-others-in-tire-cartel- case?copied=1
[179] https://www.tyrepress.com/2019/12/tyremakers-among-52-automotive-suppliers-in-us23-million-antitrust-settlement/

## V.    TOLLING OF THE STATUTES OF LIMITATIONS

106.    Class member purchases of tires within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

107.    Plaintiffs and the Class did not know and could not have known of Defendants' illegal conduct until the European Commission announced dawn raids in the tire industry on January 30, 2024. Before then, Plaintiffs and the Class had no reason to believe that they paid prices for tires that were affected by Defendants' illegal conduct, and thus had no duty until then to investigate the claims set forth in this Complaint. Defendants' secret price-fixing agreements were inherently self-concealing.

108.    Additionally, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct. For example, Michelin attributed its 12% price increase on passenger and light truck replacement tires in 2022 to "market dynamics."[180] Goodyear attributed its July 1, 2022 price increase on consumer tires to rising raw-materials and other inflation-impacted costs.[181] Pirelli attributed its April 11, 2022 price increase to "changing market conditions."[182]

109.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Classes, the four-year statutes of limitations governing claims under the Sherman Act were tolled at least until January 30, 2024, pursuant to the injury- discovery rule and the doctrine of fraudulent concealment.

---

[180] https://www.prnewswire.com/news-releases/michelin-implements-price-increase-across-passenger-brands-and-commercial-offers-in-north-american-market-301435108.html
[181] https://www.tirebusiness.com/news/goodyear-raise-north-america-tire-prices-july-1
[182] https://www.tirereview.com/pirelli-increases-price-for-tires/

## CLASS ACTION ALLEGATIONS

110. The Class's claims derive directly from Defendants' course of conduct.

111. Defendants have engaged in uniform and standardized conduct toward the Classes. Defendants did not materially differentiate in their actions or inactions toward members of the Classes. The objective facts on these subjects are the same for all class members.

112. Within each Claim for Relief asserted by the Classes, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed classes pursuant to Fed. R. Civ. P. 23.

113. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, allowing for a multistate or nationwide class or classes for some or all claims.

114. This action may be brought and properly maintained as a class action because the questions it presents are of a common or general interest, and of many persons, and also because the parties are numerous and it is impracticable to bring them all before the Court. Plaintiffs may sue for the benefit of all as a representative party pursuant to Federal Rule of Civil Procedure 23.

### The Nationwide Class

115. Plaintiffs bring this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of himself and a Nationwide Class defined as follows:

> All persons or entities that purchased replacement tires indirectly, for use and not resale, from Defendants within a state or territory of the United States whose laws permit an indirect purchaser to pursue a claim for anticompetitive conduct, from January 1, 2020, until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period").

116.     Excluded from the Nationwide Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### The Damages Class

117.     Plaintiffs also bring this action and seeks to certify a subclass under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Damages Class composed of class members seeing seeking damages pursuant to the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "Indirect Purchaser States"). The Damages Class is defined as follows:

> All persons or entities in the Indirect Purchaser States that purchased replacement tires other than directly from Defendants for their own use and not resale, from January 1, 2020, until the time that the adverse effects of Defendants' anticompetitive conduct ceased (the "Class Period") (the "Damages Class")

118.     Excluded from the Damages Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### Numerosity

119.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).

120.     The members of the Classes are so numerous that a joinder of all members would be impracticable. Defendants have sold millions of price inflated tires across the United States, including in every state that permits indirect purchasers to bring a claim for damages. Indeed, in 2022, USTMA reported over 277 million tires were sold in the replacement market.

121.     The number of class members is well beyond what is required for the numerosity requirement of Rule 23.

### Ascertainability

122.     The Classes are ascertainable.

123.     The defined Classes consist of individuals who purchased replacement tires indirectly from Defendants for use and not resale. This identity of these individuals can be determined through records maintained by Defendants, resellers, and purchasers.

124.     This information can be used to provide members of the classes with direct notice pursuant to the requirements of Rule 23 and the Due Process Clause of the United States Constitution.

### Typicality

125.     Plaintiffs' claims are typical of the members of the Classes.

126.     Plaintiffs' claims are the same as those asserted by members of the Classes. Plaintiffs, like the members of the Classes, purchased tires during the Class Period indirectly from Defendants and has been harmed by those practices in a manner typical of each of the Classes.

127.     Plaintiffs allege injuries that are not unique to them but are typical of members of each of the Classes, including measures of damages and/or nominal damages.

128.     Plaintiffs allege that their injuries flows from the common course of conduct alleged as to Defendants' conduct.

129.     Plaintiffs are similarly positioned as to each member of the Classes. As such, their injuries can be redressed in the same manner as any redress provided to the members of the Classes (and vice versa).

**Adequate Representation**

130.    Plaintiffs will fairly and adequately protect the interests of the class members.

131.    Plaintiffs are committed to putting the interest of the Classes ahead of their own and to act in the best interest of members of the Classes.

132.    Plaintiffs understand their obligations to the Classes and are committed to monitoring and supervising developments in the case and class counsel.

133.    Plaintiffs have retained competent counsel experienced in antitrust law and complex class action litigation.

134.    Plaintiffs have retained counsel with the resources and capital to litigate the case on behalf of the Classes.

135.    Plaintiffs and their counsel intend to prosecute this action vigorously and to obtain relief, including both injunctive and monetary relief, that will remedy the root problem with Defendants' practices rather than merely treat the symptoms.

**Superiority**

136.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive and/or corresponding declaratory relief appropriate with respect to each class as a whole.

137.    The class device is superior to all other available methods of adjudication, as it would make little sense for each Class member to separately prove the common conduct in which Defendants have engaged.

138.     Moreover, damages suffered by each individual member of the Class may be small, meaning that the expense or burden of individual litigation would make it very difficult or impossible for individual class members to redress their injury individually.

139.     Because damages may be small, individual members of the Classes may not have a rational economic interest in individually controlling the prosecution of a single action, and the burden imposed on the judicial system from having to individually adjudicate such claims will be significant in comparison to the value of individual claims.

140.     Class litigation is thus superior to individual litigation and is the best procedural device to vindicate the rights of the members of the Classes.

141.     In addition, class litigation will streamline the management of the litigation, such that the expense, burdens, inconsistencies, economic infeasibility, and other negative effects of individual mitigation will be lessened if not eliminated.

142.     In sum, class litigation is superior because it mitigates significant inefficiencies and barriers that would result from individual litigation. In fact, absent invocation of the class device, the classes' claims would likely not be vindicated individually, and Defendants' anticompetitive practices will persist.

**Commonality and Predominance**

143.     This action and the claims asserted by the Classes satisfy the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because there are many questions of law and fact that are common as to all the members of the Classes.

144.     These questions of fact and law concern Defendants' conduct, which is common as to the members of the Classes, and answers to those questions would provide answers to issues posed by claims asserted by all members of the Classes.

145. These common issues will predominate at trial, and any individual issues that may arise would not outweigh the predominance of common issues.

146. Common issues that will predominate at trial include, without limitation, the following:

    a. Whether Defendants contracted, combined, or conspired with one another to restrain trade of tires at any time during the Class Period;

    b. Whether Defendants' conduct caused the prices of tires sold indirectly to wholesalers, retailers, and consumers to be higher than the competitive level as a result of their restraint of trade;

    c. Whether Plaintiffs and the other members of the Classes were injured by Defendants' conduct and, if so, the determination of the appropriate classwide measure of damages; and

    d. Whether Plaintiffs and other members of the Classes are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

**Grounds Generally Applicable to the Classes**

147. Plaintiffs intend to seek injunctive relief ending Defendants' unlawful and anticompetitive conduct.

148. Plaintiffs are properly situated to seek such an injunction because Defendants have acted on grounds generally applicable to Plaintiffs and the members of the Classes, making final injunctive relief or declaratory relief appropriate with respect to the Classes as a whole.

**REALLEGATION AND INCORPORATION BY REFERENCE**

149. Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Classes.

## CLAIMS FOR RELIEF

### COUNT I
### Section 1 of the Sherman Act (15 U.S.C. § 1)
(On behalf of the Nationwide Class)

150.    Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially restraining trade in the market for new replacement tires for passenger cars, vans, trucks, and buses sold within the United States, with the purpose and effect of raising prices.

151.    Defendants' agreements are transactions in interstate commerce, as are the replacement tires themselves, which are delivered using instrumentalities of interstate commerce.

152.    Defendants collectively control over 64% of the new replacement tires market.

153.    Defendants' agreements are together and individually per se violations of Section 1 of the Sherman Act. This is in part because the primary objective of the agreements is to force prices in the new replacement tires market to increase, maintain or stabilize at levels above what would have occurred in a competitive market.  In fact, because Defendants achieved that objective, the prices for new replacement tires have increased 21.4% in the last few years.

154.    This injury, along with others alleged in this Complaint, are injuries that the antitrust laws were intended to prevent. Plaintiffs and the Class have suffered and will continue to suffer these injuries, including paying an anticompetitive overcharge for new replacement tires by reason of Defendants' anticompetitive agreements. Plaintiffs and the Class have been and will be injured by Defendants' violations of Section 1 of the Sherman Act.

**COUNT II**
**Violation of State Antitrust Statutes**
(On behalf of the Damages Class)

155.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of tires in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

156.    The contract, combination, or conspiracy consisted of an agreement among Defendants to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for new replacement tires, including in the United States and its territories.

157.    In formulating and effectuating this conspiracy, Defendants performed acts in furtherance of the combination and conspiracy, including agreeing to fix, increase, inflate, maintain, or stabilize effective prices of new replacement tires purchased by Plaintiffs and members of the Class.

158.    Defendants engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of new replacement tires. As a direct and proximate result, Plaintiffs and members of the Damages Class were deprived of free and open competition and paid more for new replacement tires than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the states included herein were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

159.    Accordingly, Plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

Defendants' anticompetitive acts described above were knowing, willful and constitute violations of the following state antitrust statutes.

160.    **Arizona**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' conspiracies had the following effects in Arizona: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

161.    **California**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq*. During the Class Period, Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720. Each defendant has acted in violation of Cal. Bus. & Prof. Code § 16720 to fix, raise, stabilize, and maintain prices of new replacement tires at supracompetitive levels. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of new replacement tires. For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the price of new replacement tires. The combination and conspiracy alleged herein

43

has had, inter alia, the following effects in California: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code § 16750(a).

162.    **Connecticut**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. Ann. § 35-24, *et seq*. Defendants' conspiracies had the following effects in Colorado: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Conn. Gen. Stat. Ann. § 35-24, *et seq*.

163.    **District of Columbia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Defendants' combinations or conspiracies had the following effects in the District of Columbia: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of

the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under D.C. Code § 28-4501, *et seq*.

164.    **Hawaii**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq*. Defendants' conspiracies had the following effects in Hawaii: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Hawaiian commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq*.

165.    **Illinois**: Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*. The Defendants' combinations or conspiracies had the following effects in Illinois: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq*.

166.   **Iowa**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects in Iowa: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

167.   **Kansas**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. § 50-101, *et seq*. Defendants' combinations or conspiracies had the following effects in Kansas: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kan. Stat. § 50-101, *et seq*.

168.    **Maine**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101. Defendants' combinations or conspiracies had the following effects in Maine: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Me. Rev. Stat. Ann. tit. 10, § 1104.

169.    **Maryland**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law § 11-201, *et seq*. Defendants' combinations or conspiracies had the following effects in Maryland: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Md. Code Ann., Com. Law § 11-201, *et seq*.

170.    **Michigan**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq*. Defendants' combinations or conspiracies had the following effects in Michigan: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed,

maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Mich. Comp. Laws § 445.771, *et seq*.

171.    **Minnesota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects in Minnesota: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Minn. Stat. § 325D.49, *et seq*.

172.    **Mississippi**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code § 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects in Mississippi: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period,

Defendants' illegal conduct substantially affected Mississippi commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Miss. Code § 75-21-1, *et seq*.

173. **Nebraska**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects in Nebraska: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under Neb. Rev. Stat. § 59-801, *et seq*.

174. **Nevada**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects in Nevada: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nev. Rev. Stat. Ann. § 598A.010, *et seq*.

175. **New Hampshire**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Ann. § 356:1, *et seq*. Defendants'

49

combinations or conspiracies had the following effects in New Hampshire: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq*.

176.    **New Mexico**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects in New Mexico: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Statutes Annotated § 57-1-1, *et seq*.

177.    **New York**: Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws § 340, *et seq*. Defendants' combinations or conspiracies had the following effects in New York: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages

50

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. The conduct set forth above is a per se violation of the Donnelly Act, § 340, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York General Business Laws § 340, *et seq*.

178.     **North Carolina**: Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes § 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects in North Carolina: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina General Statutes § 75-16, *et seq*.

179.     **North Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects in North Dakota: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class

Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-08.1-01, *et seq*.

180.    **Oregon**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' combinations or conspiracies had the following effects in Oregon: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.780, *et seq*.

181.    **Rhode Island**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-4, *et seq*. The Rhode Island statutes allow actions on behalf of indirect purchasers for conduct during the Class Period. Defendants' combinations or conspiracies had the following effects in Rhode Island: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-11, *et seq*.

182.    **South Dakota**: Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects in South Dakota: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws § 37-1-3.1, *et seq*.

183.    **Tennessee**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. Defendants' combinations or conspiracies had the following effects in Tennessee: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tenn. Code Ann. § 47-25-101, *et seq*.

184.    **Utah**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq*. Defendants' combinations or conspiracies had the following effects in Utah: (1) price competition for new replacement tires was restrained,

suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

185. **Vermont**: Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vermont Stat. Ann. § 2453, *et seq.* Defendants' combinations or conspiracies had the following effects in Vermont: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann.§ 2465, *et seq.*

186. **West Virginia**: Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-3, *et seq.* Defendants' combinations or conspiracies had the following effects in West Virginia: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-9, *et seq*.

187. **Wisconsin**: Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. § 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects in Wisconsin: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wis. Stat. § 133.01, *et seq*.

<u>**COUNT III**</u>
**Violation of State Consumer Protection Statutes**
(On behalf of the Damages Class)

188. Plaintiffs repeat the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

189. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

190. **Alaska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which the new replacement tires at issue were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects in Alaska: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and new replacement tire purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

191. **California**: Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed new replacement tires in California, and committed and continue to commit acts of unfair competition, as defined by Cal. Bus. & Prof. Code § 17200, *et seq*., by engaging in the acts and practices specified above. This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203

56

and 17204, to obtain restitution from these Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code § 17200, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated Cal. Bus. & Prof. Code § 17200. The acts, omissions, misrepresentations, practices and nondisclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Cal. Bus. & Prof. Code § 16720, *et seq*., set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code § 16720, *et seq*., and whether or not concerted or independent acts, are otherwise unfair, unconscionable unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of new replacement tires in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused, and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially inflated prices for new replacement tires. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in

this Complaint violates Cal. Bus. & Prof. Code § 17200, *et seq*. As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

192.    **Colorado**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*. Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as an actual or potential purchaser of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects in Colorado: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and purchasers of new replacement tires. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6- 1-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

193.    **Florida**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act,

Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects in Florida: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Fla. Stat. § 501.201, *et seq*.

194. **Minnesota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*. Defendants engaged in unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as purchasers of the Defendants' goods, and which caused Plaintiffs to suffer injuries. Defendants took efforts to conceal their agreements from Plaintiffs and the members of the Damages Class. Defendants' unlawful conduct had the following effects in Minnesota: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and new replacement tire purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly,

Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

195.  **Nebraska**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants' unlawful conduct had the following effects in Nebraska: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants marketed, sold, or distributed new replacement tires in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and new replacement tire purchasers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

196.  **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*. Defendants sold new replacement tires in New Hampshire and deceived Plaintiffs and Damages Class Members in New Hampshire into believing that the new replacement tires were competitively priced. Defendants' unlawful conduct had the following effects in New Hampshire: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants marketed, sold, or distributed new replacement tires in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and new replacement tires purchasers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. 46 Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

197. **New Mexico**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*. In New Mexico, price-fixing is actionable as an "unconscionable trade practice" under N.M. Stat. § 57-12-2(E) because it "takes advantage of the lack of knowledge ... of a person to a grossly unfair degree" and also results in a "gross disparity between the value received by a person and the price paid." Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no meaningful ability to negotiate a lower price from wholesalers. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing new replacement tires because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of new replacement tires, including their illegal conspiracy to secretly fix the price of new replacement tires at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. Defendants' unlawful conduct had the following effects in New Mexico: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

198.  **New York**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which new replacement tires were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their coconspirators made public statements about the prices of new replacement tires that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for new replacement tires; and Defendants alone possessed material information that was relevant to consumers but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New

York, New York class members who indirectly purchased new replacement tires were misled to believe that they were paying a fair price for new replacement tires or the price increases for new replacement tires were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing new replacement tires would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing new replacement tires would have a broad impact, causing business class members who indirectly purchased new replacement tires to be injured by paying more for new replacement tires than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of customers business that purchase new replacement tires in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects in New York: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants marketed, sold, or distributed new replacement tires in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed new replacement tires in New York. Plaintiffs

and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

199.    **North Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which new replacement tires were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation, and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Defendants publicly provided pretextual and false justifications regarding their price increases. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and injury to commercial and institutional indirect purchasers along with broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers and commercial and institutional indirect purchasers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects in North Carolina: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for

new replacement tires. During the Class Period, Defendants marketed, sold, or distributed new replacement tires in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates, dominated and controlled, manufactured, sold and/or distributed new replacement tires in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

200. **North Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which the new replacement tires at issue were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for new replacement tires. Defendants misrepresented to all purchasers during the Class Period that Defendants' new replacement tire prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and new replacement tires purchasers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of new replacement tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing new replacement tires at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

201.    **Rhode Island**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which new replacement tires were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for new replacement tires. Defendants owed a duty to disclose such facts and considering the relative lack of sophistication of the average, non- business purchaser, Defendants breached that duty by their

silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' new replacement tires prices were competitive and fair. Defendants' unlawful conduct had the following effects in Rhode Island: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers, including businesses that purchase new replacement tires. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of new replacement tires, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing new replacement tires at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of new replacement tires they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

202.    **South Carolina**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade

Practices Act, S.C. Code Ann. § 39-5-10 *et seq*. Defendants' combinations or conspiracies had the following effects in South Carolina: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10 *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

203. **South Dakota**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which new replacement tires were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for new replacement tires. Defendants misrepresented to all purchasers during the Class Period that Defendants' new replacement tire prices were competitive and fair. Defendants' unlawful conduct had the following effects in South Dakota: (1) price competition for new replacement tires was restrained,

suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. Defendants' illegal conduct substantially affected South Dakota commerce and those who purchased new replacement tires in South Dakota. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of new replacement tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing new replacement tires at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of the new replacement tires they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

204. **Vermont**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which new replacement tires were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages

Class concerning Defendants' unlawful activities and artificially inflated prices for new replacement tires. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' new replacement tire prices were competitive and fair. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of new replacement tires, likely misled all commercial and institutional indirect purchasers acting reasonably under the circumstances to believe that they were purchasing new replacement tires at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont Stat. Ann. § 2451, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

205.  **West Virginia**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which the new replacement tires at issue were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class

concerning Defendants' unlawful activities and artificially inflated prices for new replacement tires. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' new replacement tire prices were competitive and fair. Defendants' unlawful conduct had the following effects in West Virginia: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. Defendants' illegal conduct substantially affected West Virginia commerce and purchasers of new replacement tires. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of new replacement tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing new replacement tires at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of the new replacement tires they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

206.   **Wisconsin**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection

Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which new replacement tires were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' new replacement tire prices were competitive and fair. Defendants' unlawful conduct had the following effects in Wisconsin: (1) price competition for new replacement tires was restrained, suppressed, and eliminated; (2) new replacement tire prices were raised, fixed, maintained, and stabilized at artificially high levels; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for new replacement tires. Defendants' illegal conduct substantially affected Wisconsin commerce and purchasers of new replacement tires. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of new replacement tires, misled all purchasers acting reasonably under the circumstances to believe that they were purchasing new replacement tires at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of the new replacement tires they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. §100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered against Defendants and that the Court grant the following:

A. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare Plaintiffs as the representatives of the Classes.

B. Enter a judgment against Defendants in favor of Plaintiffs and the Classes;

C. Grant permanent injunctive relief to remedy the ongoing effects of Defendants' unlawful and anticompetitive conduct;

D. Award Plaintiffs and the Damages Class actual and/or treble damages;

E. Award Plaintiffs and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

F. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

### JURY DEMAND

Plaintiffs demands a trial by jury on all claims so triable as a matter of right.

Dated: March 6, 2024

Respectfully Submitted,

PAUL GRIECO (0064729)
**GRIECO LAW LLC**
623 West Saint Clair Avenue
Cleveland, OH 44113
(216) 965-0009 Phone
(216) 621-2951 Fax
paul@grieco.law

EDWARD M. GRAUMAN (*p.h.v. forthcoming*)
egrauman@bathaeedunne.com
BRIAN J. DUNNE (*p.h.v. forthcoming*)
bdunne@bathaeedunne.com
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

ANDREW CHAN WOLINSKY (*p.h.v. forthcoming*)
awolinsky@bathaeedunne.com
YAVAR BATHAEE (*p.h.v. forthcoming*)
yavar@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

*Counsel for Plaintiffs and the Proposed Classes*

74